## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**LARRY LINDSEY**                                      **CIVIL ACTION**

**VERSUS**                                             **NO. 19-12281**

**DARREL VANNOY**                                      **SECTION: "D"(1)**

### REPORT AND RECOMMENDATION

Petitioner, Larry Lindsey, a Louisiana state prisoner, filed this *pro se* federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, the application should be **DISMISSED WITH PREJUDICE**.

Petitioner and co-defendant George Crawford were indicted on a charge of first degree murder under Louisiana law,[1] and both were found to be guilty as charged on January 7, 1997.[2] On January 31, 1997, petitioner was then sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[3] The Louisiana Fourth Circuit Court of Appeals affirmed his conviction and sentence on March 10, 1999,[4] and the Louisiana Supreme Court denied his related writ application on October 15, 1999.[5]

---

[1] State Rec., Vol. 2 of 8, indictment.
[2] State Rec., Vol. 4 of 8, transcript of January 7, 1997, p. 236; State Rec., Vol. 2 of 8, minute entry dated January 7, 1997; State Rec., Vol. 2 of 8, jury verdict form.
[3] State Rec., Vol. 4 of 8, transcript of January 31, 1997; State Rec., Vol. 2 of 8, minute entry dated January 31, 1997.
[4] State v. Lindsey, No. 97-KA-1098 (La. App. 4th Cir. Mar. 10, 1999); State Rec., Vol. 4 of 8.
[5] State v. Lindsey, 748 So. 2d 463 (La. 1999); State Rec., Vol. 7 of 8.

In 2004, petitioner filed with the Louisiana Fourth Circuit Court of Appeal a mandamus application alleging that he filed a post-conviction application in the state district court on or about September 22, 2000, but the district court never issued a ruling.[6]  In denying relief, the Court of Appeal stated:

> The Relator did not attach a copy of the application for post conviction relief to his writ application.  There is no indication on the docket master that Relator's application for post conviction relief was filed in the district court.  He should refile the application there.  If the Relator has any evidence to support his claim that his application was filed on September 22, 2000, he should include it with his application.  The Relator's request for a writ of mandamus is denied.[7]

In 2005, petitioner then filed another mandamus application, alleging that he had done as the Court of Appeal instructed but that the district court still had not responded.[8]  The Court of Appeal denied that application without assigning reasons on March 29, 2005.[9]  Petitioner thereafter filed a related writ application with the Louisiana Supreme Court;[10] however, on March 31, 2006, that court found that petitioner's underlying post-conviction application was untimely and therefore denied relief, stating:  "Denied.  La. C. Cr. P. art. 930.8; State ex rel. Glover v. State, 93-2330 (La. 9/5/95), 660 So.2d 1189."[11]

More than a decade then elapsed during which petitioner took **no action** to challenge his conviction or sentence in either state or federal court.  Then, finally, in a writ application he filed with the Louisiana Fourth Circuit Court of Appeal in 2018, petitioner alleged that he had filed

---

[6] State Rec., Vol. 5 of 8, "Application for Writ of Mandamus."
[7] State v. Lindsey, No. 2004-K-0870 (La. App. 4th Cir. June 25, 2004); State Rec., Vol. 5 of 8.
[8] State Rec., Vol. 5 of 8, "In re: Notice of Response to Mandamus."
[9] State v. Lindsey, No. 2005-K-0216 (La. App. 4th Cir. Mar. 29, 2005); State Rec., Vol. 5 of 8.
[10] State Rec., Vol. 8 of 8, "Application for Writ of Certiorari."
[11] State ex rel. Lindsey v. State, 925 So. 2d 1247 (La. 2006); State Rec., Vol. 8 of 8.  Article 930.8 sets forth the limitations period for filing applications for post-conviction relief.  In Glover, the Louisiana Supreme Court held that an appellate court can deny a post-conviction application as untimely under article 930.8, even if the lower court addressed the merits or did not consider timeliness.

another post-conviction application in the state district court on July 17, 2018.[12]   Because he further alleged in his writ application that the district court never issued a ruling, the Court of Appeal granted the writ application and directed the district court to act on the post-conviction application.[13]  The district court thereafter denied the post-conviction application on October 16, 2018.[14]  Petitioner's related writ applications were then likewise denied by the Louisiana Fourth Circuit Court of Appeal on December 3, 2018,[15] and the Louisiana Supreme Court on February 18, 2019.[16]   In denying relief, the Louisiana Supreme Court again noted that petitioner's underlying post-conviction application was untimely, stating: "Denied.  Relator's application was not timely filed in the district court, and he fails to carry his burden to show that an exception applies.  La.C.Cr.P. art. 930.8; State ex rel. Glover v. State, 93-2330 (La. 9/5/95), 660 So.2d 1189."[17]

On August 2, 2019, petitioner then filed the instant federal application seeking habeas corpus relief.[18]   The state filed a response arguing that petitioner's federal application was untimely,[19] and petitioner filed an amendment to his application arguing that the untimeliness should be excused because he is actually innocent.[20]

---

[12] State Rec., Vol. 1 of 8, "Writ of Mandamus and/or Writ of Enforcement."
[13] State v. Lindsey, No. 2018-K-0830 (La. App. 4th Cir. Oct. 10, 2018); State Rec., Vol. 1 of 8.
[14] State Rec., Vol. 1 of 8, minute entry dated October 16, 2018.
[15] State v. Lindsey, No. 2018-K-0987 (La. App. 4th Cir. Dec. 3, 2018); State Rec., Vol. 1 of 8.
[16] State v. Lindsey, 263 So. 3d 1143 (La. 2019); State Rec., Vol. 8 of 8.
[17] Id.
[18] Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner states that he filed his federal application on August 2, 2019, see Rec. Doc. 12, p. 2, a date which matches the date of the certificate of service on the supporting brief accompanying his federal application, see Rec. Doc. 1, p. 18.
[19] Rec. Doc. 9.
[20] Rec. Doc. 12.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a statute of limitations for petitioners seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Specifically, the AEDPA provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

In its response, the state argues that Subsection A is controlling in the instant case,[21] and petitioner does not argue otherwise.  Regarding that subsection, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).   When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration

---

[21] Rec. Doc. 9, p. 8.

of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (emphasis added).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application on October 15, 1999. Therefore, his state criminal judgment became final for AEDPA purposes ninety days later on January 13, 2000.  His federal limitations period then commenced on that date and expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).  However, even if this Court accepts as true all of petitioner's allegations concerning his efforts to seek such relief in the state courts, it does not ultimately aid him because, although he pursued two full rounds of post-conviction relief in the state courts before seeking federal relief, those two rounds of state court filings were separated by a period of more than a decade during which he took no actions to challenge his conviction or sentence.

As noted, petitioner alleges that he filed his first state post-conviction application on September 22, 2000.  Even if the Court generously assumes that (1) an application was filed on that date as alleged (despite the fact that no such application was ever received by the district court), (2) the application continuously remained pending from that date until the Louisiana Supreme Court ultimately denied relief, and (3) the application would in fact toll the federal statute

of limitations,[22] it is beyond debate that any and all statutory tolling attributable to that application would have ended no later than **March 31, 2006**, the date on which the Louisiana Supreme Court issued its judgment denying relief.[23]  However, after that date, petitioner then took no further action challenging his conviction or sentence until more than twelve years later when he filed another post-conviction application on **July 17, 2018**.[24]  That delay was fatal.  Any one-year period of inactivity renders a federal application untimely.  See, e.g., Joseph v. 29th Judicial Court, Civ. Action No. 18-1746, 2018 WL 6072244, at *4 (E.D. La. Oct. 26, 2018) ("[W]here … a petitioner has clearly allowed a period of time in excess of one year to elapse uninterrupted by any pending state court applications, the existence of that period alone renders his federal application untimely."), adopted, 2018 WL 6067874 (E.D. La. Nov. 20, 2018); Taylor v. Terrell, Civ. Action

---

[22] This third assumption may be unwarranted.  As noted, the Louisiana Supreme Court ultimately held that the underlying post-conviction application was not timely filed.  The United States Supreme Court has expressly held that time limits are conditions of filing and, therefore, an untimely state application cannot be deemed "properly filed" for the purposes of § 2244(d)(2).  Pace v. DiGuglielmo, 544 U.S. 408, 413 (2005).  "When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)."  Id. at 414 (quotation marks and brackets omitted).  Nevertheless, the Louisiana Supreme Court's reasoning was unexplained, and, absent an explanation, it is unclear **why** the application was found to be untimely (unless, of course, the court simply disbelieved that any such application was in fact filed on September 22, 2000, as alleged).  However, ultimately, the accuracy of the court's ruling is of no consequence here.  Even if the application tolled the federal limitations period, petitioner's federal application is still untimely – by many years – for the reasons explained in this opinion.

[23] A petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief.  Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

[24] Apparently, petitioner's only state court filings during that period were motions for production of documents.  However, those motions are immaterial for two reasons.

First, those motions were not filed until **2013** and **2017**.  State Rec., Vol. 1 of 8, minute entries dated July 31, 2013, and July 20, 2018; State Rec., Vol. 1 of 8, "Motion for Production of Documents Pursuant to LSA-R.S. 44:1 et seq" (dated September 28, 2017).  By that time, the federal statute of limitations had already expired.  Once the federal limitations period expires, "[t]here [i]s nothing to toll."  Butler v. Cain, 533 F.3d 314, 318 (5th Cir. 2008).

Second, in any event, such motions seeking documents are not considered applications "for State post-conviction or other collateral review" for tolling purposes because they are preliminary in nature and do not directly call into question the validity of a petitioner's conviction or sentence.  Higginbotham v. Tanner, Civ. Action No. 10-1130, 2011 WL 3268128, at *1 (E.D. La. July 29, 2011); Parker v. Cain, Civ. Action No. 02-0250, 2002 WL 922383, at *2 n.22 (E.D. La. May 1, 2002), certificate of appealability denied, No. 03-30107 (5th Cir. June 23, 2003); Boyd v. Ward, Civ. Action No. 01-493, 2001 WL 533221, at *4 (E.D. La. May 15, 2001), certificate of appealability denied, No. 01-30651 (5th Cir. Aug. 22, 2001).

No. 07-2890, 2007 WL 3245455, at *2-3 (E.D. La. Nov. 2, 2007).  Here, even petitioner himself indicates that he had a period of inactivity of more than twelve years.  As a result, there is simply no scenario under which petitioner's federal application can be considered timely based solely on statutory tolling.

Of course, another type of tolling is also potentially available – the AEDPA's statute of limitations "is subject to equitable tolling in appropriate cases."  Holland v. Florida, 560 U.S. 631, 645 (2010).  That said, a petitioner bears the burden of proof to establish entitlement to equitable tolling, Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002), and, frankly, it is "unavailable in most cases," Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999).  Specifically, "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights diligently, **and** (2) some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (emphasis added; internal quotation marks omitted).  Regarding the two prongs of the Holland test, the United States Supreme Court has explained:

> [W]e have expressly characterized equitable tolling's two components as "elements," not merely factors of indeterminate or commensurable weight.  Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("Generally, a litigant seeking equitable tolling bears the burden of establishing two elements").  And we have treated the two requirements as distinct elements in practice, too, rejecting requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other.  See, e.g., Lawrence v. Florida, 549 U.S. 327, 336-337, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (rejecting equitable tolling without addressing diligence because habeas petitioner fell "far short of showing 'extraordinary circumstances'"); Pace, supra, at 418, 125 S.Ct. 1807 (holding, without resolving litigant's argument that he had "satisfied the extraordinary circumstance test," that, "[e]ven if we were to accept [his argument], he would not be entitled to relief because he has not established the requisite diligence").

Menominee Indian Tribe of Wisconsin v. United States, 577 U.S. 250, 256 (2016).[25]    Here, petitioner has not met either prong.

Regarding the "exceptional circumstances" prong, petitioner appears to argue that equitable tolling is warranted due to the fact that he suffered from mental illness.[26]   However, although "mental illness *may* toll AEDPA's statute of limitations, it does not do so as a matter of right."  Smith v. Kelly, 301 F. App'x 375, 378 (5th Cir. 2008).  Rather, in order for a petitioner's mental illness to warrant equitable tolling, he "(i) must make a threshold showing of incompetence and (ii) must show that this incompetence affected his ability to file a timely habeas petitioner [sic]."  Jones v. Stephens, 541 F. App'x 499, 505 (5th Cir. 2013).  Therefore, "[t]o establish the effects of his mental illness, including his medication, entitles him to equitable tolling, [a] petitioner must show that the circumstances prevented him from seeking federal *habeas corpus* relief in a timely manner."  Noble v. Cooper, No. 11-2866, 2012 WL 1135857, at *1 (E.D. La. Apr. 4, 2012).  And, if a petitioner was capable of filing pleadings seeking post-conviction relief in the state courts despite his mental illness, that fact obviously undercuts any suggestion that he was incapable of similarly seeking habeas corpus relief in federal court.  Id.

In this case, petitioner sought post-conviction relief in the state courts, through all three levels of the state court system, on two separate occasions.  Moreover, the first of those applications was allegedly filed in 2000, **before his federal limitations period expired**.  If his mental illness did not prevent him from seeking relief in the state courts during that time, then any suggestion that it prevented him from similarly seeking relief in federal court is simply too

---

[25] Menominee Indian Tribe was not a habeas corpus case.  However, its equitable tolling discussion is expressly based on the Supreme Court's interpretation of Holland; therefore, the reasoning therein is applicable to habeas cases.  See, e.g., Brian R. Means, Federal Habeas Manual § 9A:83 (May 2020 Update).

[26] See Rec. Doc. 1, pp. 11-12.

speculative to succeed. See Higginbotham v. Tanner, Civ. Action No. 10-1130, 2011 WL 3268128, at *3-5 (E.D. La. July 29, 2011); Williams v. Quarterman, Civ. Action No. H-08-2162, 2009 WL 7326065, at *5 (S.D. Tex. Aug. 24, 2009).  Therefore, petitioner simply has not established that his mental illness constituted an "extraordinary circumstance" which "stood in his way and prevented timely filing."  Holland, 560 U.S. at 649.

Moreover, in any event, petitioner also cannot meet the "diligence" prong of the Holland analysis.  Regarding the diligence requirement, a petitioner need not show that he exercised the "maximum feasible diligence"; rather, "[t]he diligence required for equitable tolling purposes is reasonable diligence."  Holland, 560 U.S. at 563 (quotation marks omitted).  Nonetheless, the undersigned cannot say that petitioner exercised even reasonable diligence in this case for the following reasons.

Again, even if the Court accepts as true petitioner's allegation that he diligently filed his first state post-conviction application on September 22, 2000, all proceedings related to that post-conviction application ended when the Louisiana Supreme Court ultimately denied relief on March 31, 2006.  Petitioner then took no other action whatsoever in either state or federal court for more than **twelve years**.  Once again, that is fatal, because far shorter periods of inactivity have been found to defeat requests for equitable tolling.  See, e.g., Tsolainos v. Cain, 540 F. App'x 394, 399-400 (5th Cir. 2013) ("We have held that state prisoners who were aware that their state post-conviction proceedings were no longer pending and waited to file federal habeas petitions between **four and six months** after the AEDPA limitation period began to run did not exercise reasonable diligence." (emphasis added)).  Simply put:  "[e]quity is not intended for those who sleep on their rights."  Mathis v. Thaler, 616 F.3d 461, 474 (5th Cir. 2010) (quotation marks omitted).

Finally, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013).  In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).  In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims.  Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996.  Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
>
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup and House, or, as in this case, expiration of the statute of limitations.  We caution, however, that tenable actual-innocence gateway pleas are rare:  "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  Schlup, 513 U.S., at 329, 115 S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

In the instant case, petitioner argues that he is actually innocent.[27]  However, he has not made the showing required under Perkins for the following reasons.

Petitioner was convicted of first degree murder.  Louisiana law defines that offense as, inter alia, "the killing of a human being … [w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person."  La. Rev. Stat. Ann. § 14:30(A)(3). "Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act.  Specific intent need not

---

[27] Rec. Doc. 12, pp. 2-4.

be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant." State v. Golson, 658 So. 2d 225, 230 (La. App. 2d Cir. 1995) (citations omitted). "Specific intent to kill or inflict great bodily harm can be inferred from a shooting which occurs at a fairly close range." State v. Harris, 859 So. 2d 690, 693 (La. App. 4th Cir. 2003); accord Robinson v. Cain, Civ. Action No. 07-3651, 2010 WL 3170257, at *10 (E.D. La. Mar. 19, 2010), adopted, 2010 WL 3170081 (E.D. La. Aug. 6, 2010).

In assessing a claim of actual innocence, a court normally first examines the evidence presented at trial and on which the petitioner's conviction was based. See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014). In the instant case, the Louisiana Fourth Circuit Court of Appeal summarized that evidence as follows:

> At trial the victim's mother, Linda McDonald, testified that her daughter, Sherri Bailes, was twenty-eight years old on September 22, 1994, when she was killed. She lived with her mother and left two children who are being raised by Ms. McDonald. Sherri worked as an outside sales agent for Minute Man Press, and she had a cocaine problem.
>
> Dr. Alvaro Hunt, an expert in forensic pathology, testified that he performed the autopsy on Sherri Bailes in September of 1994. He found that she suffered severe gunshot wounds from a bullet that passed through her right arm and into her right chest cavity. It then struck her right lung and her aorta. The bullet next went into her abdominal cavity where it struck her spleen and then came to rest against the twelfth rib. A second bullet entered the right side of her abdomen approximately five inches to the right of her navel. The bullet went through the abdomen as well as the membrane which supports the uterus. It lodged in the left side of her buttocks. Both bullets were recovered. The bullet wound to the right side of her chest caused her death. The doctor stated that Ms. Bailes might have been conscious five minutes after being shot, and she could have driven a car a short distance. Chemical analysis of body fluids from the victim's bile and vitreous fluid from the inside of her eye globe indicated that the victim recently had ingested cocaine.

State Trooper Anthony Graffeo, who was formerly an officer with the New Orleans Police Department assigned to the Homicide Division, testified that he investigated the death of Sherri Bailes and the shooting of Elijah Mitchell. On September 22, 1994, the officer went to the 2000 block of Thayer Street, which is located near the Fischer project. By the time the officer arrived, the two victims had been taken to the hospital. At the scene, the officer found a white Oldsmobile parked on the right hand side. There was broken glass in the back of it and eight spent nine-millimeter casings and a live nine-millimeter round. A black and white Atlanta Falcon's hat found on the ground had a bullet hole through the top right peak. A black Corvette was parked approximately 270 feet beyond the Oldsmobile. The Corvette was off the street and in the bushes. The back window was completely blown out, and the evidence showed it had recently been shattered because little particles of glass still clung to the rim of the windshield. A nine-millimeter spent casing was found in the passenger seat. A pool of blood was still standing in the passenger seat and in the driver's seat. A wrapped white rock of cocaine was also found on the front seat.[FN 1]

[FN 1]  The parties stipulated that the rock was tested and proved to be cocaine.

The next day the officer met with Shirley Davis, a witness, who gave him the names of the defendants. She said Larry Lindsey was the perpetrator and a man named "George" was with him. Ms. Davis was shown a photographic line-up and selected the picture of Larry Lindsey. Sherri Bailes died on the way to the hospital and although he was in critical condition, Elijah Mitchell recovered. After an arrest warrant for Larry Lindsey was issued, he was arrested on October 6, 1994. Meanwhile the officer discovered the full name of George Crawford, and Elijah Mitchell also named him as a perpetrator. A photographic line-up was prepared, and Mitchell selected George Crawford's photo.

Officer Byron Winbush, an expert in firearms examination and analysis, testified that a firing pin makes an impression on the bullets fired, and all bullets fired from the same gun contain similar impressions and are different from bullets fired from another gun. Officer Winbush tested the bullet casings and the two bullets that were recovered in this case. The two bullets taken from the victim's body matched each other, indicating they were fired from the same gun, and the other two casings matched each other. Officer Winbush could not say that the two recovered bullets belonged to either set of casing. He noted that the bullets could belong to either group of casings. The officer testified that all the casings could have come from the same gun. Two guns were involved in the shooting.

Elijah Mitchell, the twenty-eight year old survivor of the shooting, testified that he was with Sherri Bailes, his girlfriend, when she was killed. Mitchell said that Ms. Bailes had come up to Thayer Street to pick him up. She was alone in her Corvette when he got into the front passenger seat. The two began arguing. Suddenly, Mitchell was aware that someone was approaching from the right. As he turned, he was shot in the head. He turned more to the right, and he was shot "a

couple more times." Mitchell said the two men who shot him were "Larry and George." Larry Lindsey was carrying a "Tech 9" weapon, and George Crawford had a pistol. Lindsey had a black bandana over his nose and mouth. Mitchell said he was shot ten times, and he raised his shirt to show the jury the scars on his stomach. After the shooting started, Ms. Bailes' car began moving and moved thirty or forty yards before stopping. Mitchell identified the black hat with the bullet hole in the top as the one he was wearing when the shooting occurred.

Mitchell was shown two photographic line-us from which he selected the photos of the defendants. Mitchell said he was involved in three arguments with the defendants: the first was really Sherri Bailes' argument, the second concerned Mitchell's cousin, and the third was about Mitchell's property. After the third argument and only two days prior to the shooting, the men threatened him. Mitchell admitted he has two prior convictions from New Orleans: one from 1990 for receiving stolen goods, and the other from 1989 for simple burglary. Mitchell has two other convictions from Dallas: one for burglary of a building, and the other for possession of cocaine. Both are from 1996. He received five years and two years probation respectively for the convictions in Dallas. At the time of trial Mitchell was incarcerated in Texas for violating his probation.

Detective Gary Marchese, of the Homicide Division, testified that he showed a photographic line-up to another witness. He said Shirley Davis came to police headquarters to look at the photographs. She identified the photo of George Crawford.

Ms. Shirley Davis testified that she was living at 1020 LeBeouf Street, Apartment 1C, in the Fischer Project in September of 1994 when she witnessed a shooting. Ms. Davis said as she was parking in her back driveway, she noticed a car behind her. Ms. Davis recognized both Larry Lindsey and George Crawford. Lindsey is her ex-brother-in-law, and she had seen Crawford in the project for a few months. She knew his first name was George. When the two men got out of the car, they had guns in their hands and blue bandanas over their mouths. The men walked through the breezeway, and then the shooting started. Ms. Davis said she saw them shooting at two people in a black Corvette. After the shooting, the two gunmen walked back to their car and drove away. A few days later when Ms. Davis went to police headquarters to view a photo line-up, she selected Larry Lindsey's picture. Sometime later Ms. Davis looked at another line-up and selected George Crawford's picture. Ms. Davis said that her mother and several of her cousins were in the courtyard when the shooting took place. She declared that she never spoke with them about the shooting.

The defense offered a stipulation that if Officer Kyle Henry were to testify, he would say that when he arrived at the scene of the crime, he observed a black Corvette with the rea window and passenger-side window shattered. In the car were two victims suffering from multiple gunshot wounds, and neither person could give a statement.[28]

---

[28] State v. Lindsey, No. 97-KA-1098, pp. 2-6 (La. App. 4th Cir. Mar. 10, 1999); State Rec., Vol. 4 of 8.

Clearly, ample evidence of petitioner's guilt was introduced at trial, and so he faces a substantial challenge to establish a viable "actual innocence" claim.  In fact, the United States Supreme Court has explained that, in order to assert a credible claim of actual innocence, a petitioner is normally required "to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful."  Schlup v. Delo, 513 U.S. 298, 324 (1995).

Here, petitioner has not presented any new evidence of that caliber – or, indeed, any new evidence whatsoever.  Instead, he simply argues that he was not competent to stand trial.[29]  However, that argument misses the mark.  To demonstrate "actual innocence," a petitioner must show that, "**as a factual matter**, that he did not commit the crime of conviction."  Ward v. Cain, 53 F.3d 106, 108 (5th Cir. 1995) (emphasis added).  Therefore, the issue in an "actual innocence" inquiry is the petitioner **committed the underlying crime**, not whether he was **competent to stand trial for that crime,** which is an entirely separate and unrelated question.  See Moen v. Czerniak, No. CV-02-10, 2006 WL 2270879, at *7 (D. Ore. Aug. 8, 2006) ("Here, petitioner does not assert that he is actually innocent of Aggravated Murder.  Instead, he submits that much like a person who is actually innocent of a crime, the miscarriage of justice exception should extend to a substantive claim of incompetence to stand trial.  Petitioner has not cited, and the court is unable to find, any controlling authority which extends the fundamental miscarriage of justice exception

---

[29] Rec. Doc. 12, pp. 3-4.

to a prisoner who limits his allegation only to his own competency, but does not allege that he is actually innocent.   Because petitioner has not presented new evidence demonstrating his innocence, he cannot invoke the fundamental miscarriage of justice exception."); see also Singleton v. Guttierrez, Nos. CV 110765 and CR 96-0008, 2011 WL 838918, at *2 (C.D. Cal. Mar. 4, 2011); Alaouie v. Ercole, No. 08 Civ. 3277, 2009 WL 2001741, at *4 (S.D.N.Y. July 9, 2009).

For these reasons, petitioner has not met "the threshold requirement" for Perkins to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"   Perkins, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329).   Accordingly, Perkins does not aid him.

To summarize:  Even if petitioner is given the benefit of every doubt, statutory tolling does not render his federal application timely.   Given that fact, he must establish either that equitable tolling is warranted or that he is actually innocent.   He has fallen far short of establishing either. According, his federal application is untimely, and so the Court is precluded from considering his underlying substantive claims.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Larry Lindsey be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[30]

       New Orleans, Louisiana, this __29th__ day of April, 2021.


_____
**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[30] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.